#27124-a-GAS
**2015 S.D. 68**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

VOORHEES CATTLE COMPANY,
LLP, d/b/a Onida Feeding Company,
a South Dakota limited liability
partnership,                                           Plaintiff,


        v.


DAKOTA FEEDING COMPANY, LLC,
a South Dakota limited liability company;
ONIDA FEEDING COMPANY, LLC,
a South Dakota limited liability company;
SCOTT MATHISON, individually; and
RICK JENSEN, individually,                              Defendants,


        and


DAKOTA FEEDING COMPANY, LLC,
a South Dakota limited liability company,      Defendant, Third Party
                                               Plaintiff and Appellant,

        v.


PATRICK VOORHEES, individually;
MERLIN VOORHEES, individually,                 Third Party Defendants,


        and


B AND B EQUIPMENT, INC.,
a South Dakota Corporation,                     Third Party Defendant and
                                                Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
SULLY COUNTY, SOUTH DAKOTA
* * * *

THE HONORABLE JOHN L. BROWN
Judge
* * * *

ARGUED ON MARCH 25, 2015
OPINION FILED **07/29/15**

MARK A. MORENO of
Moreno, Lee & Bachand, P.C.
Rapid City, South Dakota

WILLIAM M. VAN CAMP of
Olinger, Lovald, McCahren
  & Reimers, P.C.
Pierre, South Dakota

ROBERT B. ANDERSON of
May, Adam, Gerdes & Thompson
Pierre, South Dakota

Attorneys for defendant, third party plaintiff and appellant.

Attorneys for third party defendant and appellee.

#27124

SEVERSON, Justice

[¶1.]    This case arose out of a foreclosure action brought by Voorhees Cattle Co. (Voorhees) against Dakota Feeding Co. (DFC).  In its answer to the complaint, DFC filed a third party complaint against B and B Equipment, Inc. (B & B) for breach of contract; B & B counterclaimed alleging impossibility of performance and breach of contract by DFC.  A jury returned a verdict for Voorhees on the foreclosure claim and for B & B on its breach of contract and impossibility of performance counterclaims against DFC.  The jury determined that B & B suffered damages in the amount of $103,000, and that DFC owed Voorhees $1,101,573.26, the amount necessary to pay off the contract for deed.  DFC satisfied the judgment granted to Voorhees, and therefore, the only parties to this appeal are DFC and B & B.  DFC appeals, alleging evidence admitted at trial violated the attorney-client privilege and its admission requires a new trial.  We affirm.

### Background

[¶2.]    In 2006, DFC approached Voorhees to ask whether Voorhees was interested in selling its feedlot.  Pursuant to a contract for deed, Voorhees sold DFC its feedlot "AS IS" for 1.7 million dollars.  Various aspects of the feedlot needed to be brought into compliance with the South Dakota Department of Environment and Natural Resources' (DENR) requirements.  Pertinent to this lawsuit is the feedlot's noncompliant lagoon.  Prior to the sale, Voorhees submitted plans from an engineering firm that were intended to bring the lot into compliance.  DENR conditionally approved the plans. The contract for deed required DFC "to complete the lagoon design per the DENR's approved specifications to complete the

-1-

permitting process."[1] DFC hired B & B to do the excavation necessary on the lagoon. B & B started some of the work, such as removing manure from the lagoon area, in 2006. B & B performed additional work on the feedlot over the years. Eventually problems arose with regard to satisfactorily finishing the lagoon.

[¶3.] In April of 2012, the Attorney General notified DFC that the previously submitted plans did not adequately account for wastewater overflow. DFC had still not completed the lagoon six years after purchase. Because of the noncompliance, the Attorney General notified DFC that it was required to depopulate the feedlot, which meant the lot could only have less than 1,000 head of animals. Prior to depopulating, the number of cattle in the feedlot fluctuated between roughly 5,000 to 10,000 animals. DFC defaulted on its payments to Voorhees, and Voorhees brought a foreclosure action against DFC and its principals, Scott Mathison and Rick Jensen, individually. DFC answered the complaint, alleging fraud against Voorhees—particularly that Voorhees "was aware or should have been aware" that plans which Voorhees submitted to DENR prior to the sale were not adequate to bring the property into compliance because those plans failed to "account for adequate collection of all waste water." Further, the answer alleged Voorhees misrepresented the work and cost required to bring the

---

1. The clause provided in full:

> SELLERS will seek transfer of DENR lagoon design approval and NRCS equip funds to PURCHASERS and cooperate in the transfer of permits upon the execution of this agreement. PURCHASERS agree to sign all paperwork necessary to have NRCS equip funds transferred in to PURCHASERS name only and to complete the lagoon design per the DENR's approved specifications to complete the permitting process.

feedlot into compliance with DENR standards. The answer also contained third-party claims against B & B, alleging that B & B had "breached its duty under contract to build and construct the lagoon as it has failed to do so to date."

[¶4.]      As a result of the fraud allegations, counsel for Voorhees, Thomas M. Maher, sought to depose DFC's counsel William Van Camp and subpoenaed his records concerning his representation of DFC.[2] Van Camp moved to quash the subpoena and enter a protective order. A hearing on the motion was held on August 9, 2013. At the hearing, Maher stated that it was the amended complaint containing the fraudulent allegations that caused the request to depose Van Camp and view his files. Maher explained that Van Camp had done due diligence on the 2006 transaction, such as conversing with DENR regarding compliance issues and reviewing whether the lagoon could be built based on the engineering plans Voorhees had previously submitted to DENR. He alleged that Van Camp's role in this transaction was "not just drafting" and therefore Van Camp's knowledge was relevant to the lawsuit. He stated:

> We do think he's [(referring to Van Camp)] clearly a witness for
> the Voorhees, yes. And we think his testimony is absolutely
> inconsistent with Defendants' position that the Voorhees are
> guilty of fraud. And we think he's one of the best witnesses for
> the Voorhees in that he as an attorney went up there trying to
> make sure that these plans would be permitted and approve or

---

2.    The subpoena duces tecum sought "all dates and billing records, records of meetings, contacts and/or communications/correspondence with DENR and/or South Dakota Attorney General's Office representative of DENR or Chief Deputy Attorney General Charles McGuigan, and/or Defendants' representatives or engineers, about the permitting process, lagoon design and requirements, water quantity, and all other requirements necessary for final permitting herein from before closing on the purchase of the feedlot through the present."

> don't approve a closing, and he approved the closing. . . . And I believe it's going to be shown in there that he communicated to his clients what he found. And I believe he communicated to his clients that, it's all right; you can go ahead and buy this; you're going to be able to build these plans, be it e-mail, conversation or billing records.

When asked for B & B's position on the matter, their counsel, Robert Anderson, stated that B & B was caught in the middle but the "build-ability of these plans and the improvement of the feedlot does relate to the B & B involvement." The court denied the motion, stating: "However, this does appear to be a case with a fraud claim having been filed and Mr. Van Camp having been a pertinent part of the investigation, the due diligence in the transaction of this, that I am going to deny the motion to quash."

[¶5.]		In response to the court's denial, Van Camp filed a motion to reconsider. The court held a hearing on the motion on October 2, 2013. Van Camp argued that there was no applicable fraud exception to the attorney-client privilege and that he was acting as "an ordinary attorney" by performing due diligence on the transaction. Further, he stated that there is no statute or case law in South Dakota that allows an attorney to be deposed in ongoing litigation because of a fraud complaint such as this. Van Camp explained he was resisting the motion, in part because "they can conduct the discovery they want from my client, the discovery they want from DENR to see what information is there." Maher compared Van Camp's action to that of an attorney investigating for an insurance company as in *Dakota, Minn. & E. R.R. Corp., v. Acuity (DM&E)*, 2009 S.D. 69, 771 N.W.2d 623. The court again denied Van Camp's motion.

[¶6.] As a result of the court's ruling, the parties deposed Van Camp. Van Camp also answered requests for admissions, admitting to the contents of communications between himself and his client. Van Camp admitted that he told his client's principals, Mathison and Jensen, that: they must comply with the requirements or they would face enforcement proceedings; the costs of completing the process would be substantial; they needed to immediately begin conversations with DENR about how to come into compliance with the requirements to operate the feedlot; DENR was dismissive of stretching the work out over five years; they were not to deviate from the engineer-approved plans; they must do the work as required by the conditional permit; they would "need an engineer because an engineer will need to sign off that the very detailed descriptions with requirements are completed in proper fashion;" and Van Camp was not aware of anyone in the deal that "has the authority or the ability to sign off on some of the leakage tests and pipe specifications as detailed in these requirements." These admissions were admitted into evidence at trial. Also admitted at the jury trial were letters from Van Camp to his client where he told Mathison and Jensen that he did not see anything in the agreement about the permitting requirements needed to operate the feedlot or the "hundreds of thousands of dollars" in cost to bring the feedlot into compliance.

[¶7.] DFC now appeals the introduction of those materials at trial, submitting that they are privileged materials and introduction of such was prejudicial error requiring a new trial where the privileged information cannot be used.

**Standard of Review**

[¶8.]        "This Court normally reviews a circuit court's discovery orders under an abuse of discretion standard." *DM&E*, 2009 S.D. 69, ¶ 47, 771 N.W.2d at 636. "'When we are asked to determine whether the circuit court's order violated a statutory privilege, however, it raises a question of statutory interpretation requiring de novo review.'" *Id. (*quoting *Maynard v. Heeran*, 1997 S.D. 60, ¶ 5, 563 N.W.2d 830, 833).

**Analysis**

*Attorney-client privilege*

[¶9.]        The judgment was satisfied in the foreclosure action between Voorhees and DFC, which was the initial claim in this action.  B & B's claim was simply to obtain payment for excavation work it completed.  The attorney-client privileged evidence that was admitted at trial was introduced by Voorhees, who is not a party to this appeal.  However, we must still analyze whether the evidence was privileged and whether it was prejudicial because both the foreclosure action and the third-party claim and counterclaim were included in one trial.  We do not address the related discovery issue of an attorney's work-product because it was not an issue raised or argued by the parties.

[¶10.]        South Dakota's attorney-client privilege is set forth in SDCL 19-19-502(b)[3], which provides:

---

3.    The Code Commission, with approval of the Supreme Court, renumbered the sections in SDCL chapters 19-9 to 19-13, inclusive, and 19-14 to 19-18. Therefore, "subdivision 19-19-502(b)" is substituted for "§ 19-13-3" to reflect the transfer of § 19-13-3 to subdivision 19-19-502(b).

A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client:

    (1) Between himself or his representative and his lawyer or his lawyer's representative;

    (2) Between his lawyer and the lawyer's representative;

    (3) By him or his representative or his lawyer or a representative of the lawyer to a lawyer or a representative of a lawyer representing another party in a pending action and concerning a matter of common interest therein;

    (4) Between representatives of the client or between the client and a representative of the client; or

    (5) Among lawyers and their representatives representing the same client.

"Four minimum elements exist to invoke the privilege: (1) a client; (2) a confidential communication; (3) the communication was made for the purpose of facilitating the rendition of professional legal services to the client; and (4) the communication was made in one of the five relationships enumerated in SDCL § 19-[19-502(b)]." *State v. Rickabaugh*, 361 N.W.2d 623, 624-25 (S.D. 1985). "It is the client, not the attorney, with whom the lawyer-client privilege reposes." *State v. Catch the Bear*, 352 N.W.2d 640, 645 (S.D. 1984).

[¶11.] There is no dispute that DFC is Van Camp's client. SDCL 19-19-502(a)(1). A confidential communication is one "not intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication." SDCL 19-19-502(a)(5). No one is disputing that the letters from Van Camp and communications admitted to in the requests were not intended to be disclosed to third parties. DFC asserts, and B & B does not

counter, that Van Camp was hired to protect the interests of DFC in a multi-faceted commercial undertaking. Accordingly, he rendered advice regarding legal implications of the transaction. Lastly, the letters were between Van Camp and his client, constituting a relationship under SDCL 19-19-502(b). Similarly the communications admitted to in the requests for admissions satisfy the elements of the test as those communications regarded compliance issues with the feedlot.

[¶12.] B & B asserts that "[e]ven though B & B is not arguing that the communications and admissions at issue should or should not have been admitted, the evidence in the record supports Voorhees's claim that DFC was attempting to use the attorney-client privilege to hide knowledge of certain information." B & B contends that "[b]ecause DFC put its own knowledge at issue (by claiming fraud/concealment of facts by Voorhees) the trial court could have allowed the communications and admissions to be admitted in order to prevent DFC from unfairly using the privilege as a sword, rather than a shield." However, B & B cites no case law to support such an assertion.

[¶13.] Putting a party's knowledge at issue in ongoing litigation does not necessarily exclude attorney-client communications from the scope of the privilege. Such a contention appears to misconstrue our precedent where we have held that a party may *waive* privilege by placing *advice of counsel* at issue. *Bertelson v. Allstate Ins. Co.*, 2011 S.D. 13, ¶ 53, 796 N.W.2d 685, 703 ("[A] client only waives the privilege by expressly or impliedly injecting his attorney's advice into the case. . . . [A] client only waives the privilege to the extent necessary to reveal the advice of

counsel he placed at issue." (citations omitted)).  Such is not the scenario in this case.  As one court stated:

> Advice is not in issue merely because it is relevant, and does not necessarily become in issue merely because the attorney's advice might affect the client's state of mind in a relevant manner.  The advice of counsel is placed in issue where the client asserts a claim or defense, and attempts to prove that claim or defense by disclosing or describing an attorney client communication.

*Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851, 863 (3d Cir. 1994), *see also Andrews v. Ridco, Inc.*, 2015 S.D. 24, ¶¶ 17-26, 863 N.W.2d 540, 546-50.  At no point in its pleadings did DFC place Van Camp's advice into issue by attempting to prove the claim by "disclosing or describing" Van Camp's communications.  Because there is no indication in this case that DFC "expressly or impliedly inject[ed ][its] attorney's advice into the case[,]" waiver is not an issue.  *See Bertelson*, 2011 S.D. 13, ¶ 53, 796 N.W.2d at 703.

[¶14.]		The circuit court stated that Van Camp acted in a role similar to a claims adjuster as in the case of *DM&E*.  2009 S.D. 69, ¶ 56, 771 N.W.2d at 638. *DM&E* is distinguishable.  The insurer in *DM&E* "completely delegated its claims function to outside counsel."  *Id.*  "[C]ounsel *exclusively* conducted the investigation and *solely* made the initial determination to deny the UM claim."  *Id.*  "[T]he attorney [was] not acting as a lawyer in such instance."  *Id.* ¶55.  Instead, counsel was fulfilling the ordinary business function of claims investigation.  *Id.*  In this case, Van Camp was not making business decisions, but rather rendering legal advice on the implications of a transaction.  The privilege still protects communications from an attorney rendering transactional advice even though the

attorney investigated relevant facts before communicating with a client.[4]

Therefore, these communications fall within the protection of the attorney-client privilege.

[¶15.]     Even if the court found that the communications may not have been privileged or that waiver was an issue, it should have considered whether deposing opposing counsel was the appropriate means of acquiring the information sought. The court failed to consider the implications of allowing discovery without bounds by the extraordinary means of requesting admissions from opposing counsel regarding client communications, deposing opposing counsel, and issuing a subpoena for the production of materials from counsel's case files. "Taking the deposition of opposing counsel not only disrupts the adversarial system and lowers the standards of the profession, but it also adds to the already burdensome time and

---

4.     This does not mean that the facts that Van Camp learned from other sources are protected. It is the communication rather than the information that is protected.

> For example, a client seeking legal advice on the contractual implications of his previous discussions with a third party might provide his attorney with facts detailing the meetings held with the third party and his representatives. In the client's future contract action against that third party, the client could be required to answer interrogatories or deposition questions about those meetings, even though the substance of the answers might be identical to what was previously told to the attorney. The client and his attorney would only be protected from revealing that those same facts had been communicated by the client to the attorney. Therefore, information not otherwise privileged will not acquire a privileged status simply by being communicated to, or filtered through, the attorney. But the fact that the information was communicated to the client's attorney remains privileged.

1 Paul R. Rice, Attorney-Client Privilege in the U.S. § 5:1 (2014) (emphasis omitted) (footnotes omitted).

costs of litigation." *Shelton v. Am. Motors Corp.*, 805 F.2d 1323, 1327 (8th Cir. 1986).

[¶16.] Opposing counsel "is [not] absolutely immune from being deposed." *Id.* However, the circumstances under which opposing counsel may be deposed "should be limited to where the party seeking to take the deposition has shown that (1) no other means exist to obtain the information than to depose opposing counsel, (2) the information sought is relevant and nonprivileged; and (3) the information is crucial to the preparation of the case." *Id.* (citation omitted). In this case, none of these considerations were taken into account. The court did not analyze the necessity for the discovery or consider reasonable alternative sources such as DFC's principals or other witnesses such as the DENR employees that may have spoken with DFC's attorney. *See* SDCL 15-6-26(b)(3)[5]; *see also Hickman v. Taylor*, 329 U.S. 495, 509-10, 67 S. Ct. 385, 393, 91 L. Ed. 451 (1947). The attorney for Voorhees was free to ask DFC's principals what factual information DFC knew. As the Eighth Circuit noted, clients cannot refuse, on the basis of privilege, "to disclose facts which their attorneys conveyed to them and which the attorneys obtained from independent

---

5.     SDCL 15-6-26(b)(3) provides in part:

> [A] party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (1) of this section and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative . . . only upon a showing that the party seeking discovery has substantial need . . . and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. . . . [T]he court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

sources." *Sedco Int'l, S.A. v. Cory*, 683 F.2d 1201, 1205 (8th Cir. 1982) (citing *Hickman*, 329 U.S. at 508, 67 S. Ct. at 392). However, that does not stand for the proposition that an attorney may be deposed and required to answer requests for admissions about communications to clients because a party believes opposing counsel will have relevant knowledge or suspects that attorney-client communications may provide material with which it can impeach the deposed attorney's client, as was done in this case.

*Prejudice*

[¶17.]     The circuit court erred in refusing to quash Maher's subpoena, submitted on behalf of Voorhees, to depose Van Camp and require him to submit to discovery of his file and answer requests for admissions. The circuit court committed further error in allowing privileged material to be introduced on behalf of Voorhees during the trial. However, our review of evidentiary rulings is a two-step process. *Supreme Pork, Inc. v. Masterblaster, Inc.*, 2009 S.D. 20, ¶ 59, 764 N.W.2d 474, 491. A party must demonstrate both error and that it was prejudicial. *Id.* Error is prejudicial if it "most likely has had some effect on the verdict and harmed the substantial rights of the moving party." *Schoon v. Looby*, 2003 S.D. 123, ¶ 18, 670 N.W.2d 885, 891. DFC argues that it suffered prejudice because the communications were allowed in to conclusively prove issues that are part of B &

B's claims.[6] B & B points out that independent evidence was admitted to prove elements of B & B's claim.

[¶18.] We note that in this multi-party, multi-issue trial the communications were introduced without limit and were used throughout the trial. However, B & B claimed breach of contract and impossibility of performance. A partner of B & B, Darrell Beck, testified that DFC was concerned about the costs of the lagoon project so it had B & B obtain an operating loan. DFC assigned a grant to B & B so B & B could obtain the loan. B & B drew the loan amount but never received payment from the grant, and B & B alleged that nonpayment of the grant was because of some failure on DFC's part. Further, Beck testified that DFC was not liable on the loan as he originally thought and now B & B must repay the loan, which it used in order to provide construction services for DFC. He further testified that although B & B excavated a large cell for the lagoon, it was prevented from finishing the project completely because DFC refused to hire an engineer to do the measuring and staking that the project required.

[¶19.] Even though the privileged communications should not have been introduced, nor the deposition of the attorney and further discovery of attorney-client privileged material allowed, those communications were germane to the claim by Voorhees, which is not being appealed because DFC satisfied the judgment against it. The communications did not prove, nor go to the heart of B & B's claims. B & B's claims asserted that the company was not paid for the work that it provided

---

6. SDCL 15-6-36(b) provides that "[a]ny matter admitted under this rule is conclusively established unless the court on motion permits withdrawal or amendment of the admission."

and that no engineer was hired to enable it to complete the project. Van Camp's communications to his client and the content of those communications were not relevant to DFC's conduct during the period of time that was relevant to B & B's claims. The communications occurred before DFC purchased the feedlot, whereas the matters that B & B needed to prove for its claims—breach of contract and impossibility of performance—occurred after purchase. Mathison acknowledged at trial that an engineer was needed to ensure compliance with DENR's specifications. Further, he testified that he did not expect B & B to be responsible for the redesign of the plans. It was uncontested that: B & B completed excavation work for DFC; no engineer was hired; and sufficient staking was not done so as to allow B & B to complete the project. The only issue between B & B and DFC decided by the jury was the amount of money owed B & B for the work done on the feedlot. As a result, the erroneous admission of the privileged communications was not unfairly prejudicial to DFC as against B & B. DFC's claim that the error tainted the trial is not sufficient. We affirm.

[¶20.]     GILBERTSON, Chief Justice, and ZINTER and KERN, Justices, and LINNGREN, Circuit Court Judge, concur.

[¶21.]     LINNGREN, Circuit Court Judge, sitting for WILBUR, Justice, disqualified.